11 months prior to Mr. Panate's criminal trial, disclosed to the state police, causing Ms. Hanchett to be charged with misconduct, he is entitled to qualified immunity because there is no clearly established controlling precedent that his conduct as alleged in this complaint was violative of any constitutional right. To begin, it is plaintiff's burden, as the court most recently articulated in Gray, it's up to a plaintiff in the face of a qualified immunity invocation to identify a controlling, clearly establishing precedent. Neither below in his briefs, neither the district court in its decision, nor here in this case, has Mr. Panate identified a Supreme Court or First Circuit precedent extending Brady obligations to either a line chemist not involved in the investigation with the police or district attorney's office, or in fact a supervisor, which is Mr. Hanchett's role in all of this. In the absence of any such controlling authority, this court's qualified immunity law, as articulated most recently in Eves, requires, I believe, reversal of the decision below and Mr. Hanchett's qualified immunity. Going beyond... Just on that first point, so I can just take it in pieces, there is clearly established law that the members of the investigative team have an obligation to disclose exculpatory information to the prosecutor, correct? Yes. And so is your contention the problem here is we just don't know whether a lab technician performing this is within the investigative team? I don't think it's that we don't know. I think it's that it's alleged that Ms. Froth was not and that his supervisor certainly was not. As the district court in the Brown decision back in 1998, it was Charles in the district court which suggested that it may be the case that a chemist who actually is part and parcel of the investigative team who visits the crime scene in connection with the investigation may be subject to a Brady obligation. But even in that decision, explicitly the court noted that merely a chemist who receives evidence and tests a number vial may not be. And there's been no decision in the circuit that in that circumstance someone would be subject to a Brady obligation. And what's alleged here is that a year after Mr. Panate was arrested in connection with heroin distribution, the police department submitted to the Amherst laboratory essentially numbered vials, which Ms. Froth tested again a year after the arrest investigation, and that Mr. Hanchett's, as alleged, only role was merely to assign the vial to Ms. Froth. Under those allegations, it cannot be that either one was part of the prosecution team under any precedent in the circuit. Going beyond the lack of any clearly established precedent, if the court is satisfied on that point, we range into problem one, which is... Just so I'm understanding this, your position is that that remains true today, that the lab technicians of the state have no Brady obligation? Well, Your Honor, I think in this circuit certainly hasn't reached a decision on this. The way you just put it, it was suggested to me, you were suggesting that you think that the answer coming out of this circuit should be that the lab technicians of the state who test things for the state as part of its criminal prosecution effort, if they're not tied to a particular case in the way that you described those facts, should not be treated as having any Brady obligation. I did not mean to suggest any off in that way. I think actually in response to both Ms. Froth's misconduct as well as the other very unfortunate misconduct portrayed by Ms. Dukin, the Supreme Judicial Court, in response to both of those crises in our criminal justice system, have further developed law under state precedent. And I think today, which is to be distinguished from 2012, which is the subject conduct of the complaint, I think the answer is different and I think the law has developed past where it was in 2012. Or at least the state law has. The state law. That's right, Your Honor. And I think as there was discussion in Judge Robertson's decision and is relied upon by my brother, there have been some District of Massachusetts decisions that co-state the conduct as well, which may signal further development of the law. But they don't have any sort of retrospective application to a clearly established analysis as they co-state the conduct and wouldn't be controlling the court in any way. So you say the date we need to look at is 2012. Your opponent says no, it's actually the date of trial and conviction in 2013. Isn't he right? Well, I think there are two factors here. One is, as alleged in the complaint, again, 11 months prior to that criminal trial and conviction, Mr. Hanchett disclosed to the state police the misconduct that he uncovered about Ms. Varrock. And in fact, that followed through to her very public prosecution and the withdrawal of her drug evidence in this case. So factually, that the disclosure was made in 2012, you think, makes that the date? I think it does. And for a host of reasons, I think that follows through both to plausible allegations about causation and the rest of it. But even if my brother is right that the trial date is the right one, the precedence he relies on co-states that as well. That doesn't matter. Okay, I have a question. If we were to decide in your favor on qualified immunity, then there leaves the issue of the pendant state claim for intentional infliction of emotional distress. The argument you present is that it's inexorably intertwined with the qualified immunity issue. And therefore, we have appellate jurisdiction. Why is it inexorably intertwined? Yes, because I think there is such a paucity of allegations made by Mr. Penate against Mr. Hanchett. And the 1983 supervisory claim is necessarily essentially the same claim as an intentional infliction of emotional distress. No, it isn't. No, it isn't. Is it? I don't mean to suggest that there is an identity in elements or the like. But the supervisor's conduct could arguably be a breach of state law without contradicting any clearly established federal law. There certainly are scenarios where that would be true. It was here where the allegations against Mr. Hanchett with respect to Mr. Penate are merely that he assigned to Ms. Farrakh the drug, the numbered vials to be tested. And essentially, the only other allegation against Mr. Hanchett with respect to Mr. Penate is that through Mr. Hanchett's report to the state police 11 months in advance of trial, Ms. Farrakh's drug evidence was withdrawn from Mr. Penate's trial. There cannot be stated an intentional infliction of emotional distress. But that goes to the merits. Yes, it does. Does it show that they're intentionally intertwined? The fact of the matter is state law in this area can be different than federal constitutional law. And it seems to me that a tribunal that has jurisdiction over the merits claim ought to be able to make an independent evaluation of that. Now, the district court on remand, if that's what happens, may very well decide that it shouldn't exercise supplemental jurisdiction and that it should leave that to a state court, particularly in view of the fairly rapid evolution of state court decisions in this area, which you've already referred to. Yes. I think this court's a different question. I think I understand what the court is saying. I think given the court's de novo review of the complaint and that sort of the allegations concerning the 1983 claim are the same as the intentional inflection of emotional distress, I think this court could determine that the claim should be dismissed. But in the alternative, as we urged in our brief, I think it could be remanded to the district court for determination as to whether it should exercise supplemental jurisdiction. With respect to the potential overlap or connection between the factual determination that needs to be made on the intentional emotional inflection of emotional distress claim and the section 1983 claim, it seems to me the point of possible overlap would concern deliberate indifference. I think that's right, Your Honor. Okay. So just so I understand what the government's argument is on that score, I have thought under Camillo's road list that in order for plaintiff to win, they have to show that it was clearly established that the conduct constituted deliberate indifference. Yes, Your Honor. I think that's right. Is the government's argument that the plaintiff loses on that score because it is not clearly established that the conduct was deliberate indifference, or is the government urging us to come to the conclusion that even straight up it was not deliberate indifference? And just to be clear, we're talking with respect to the intentional inflection of emotional distress? No, with respect to the section 1983 claim. Well, I think it needs to be… For supervisory liability. It needs to be clearly established both that Ms. Farrakh violated a clearly established right, and that it was clearly established that Mr. Hanchett as the supervisor would also be liable. And we decide that based on, I have thought under Camillo Robles, whether his conduct as a supervisor amounted to deliberate indifference. Is that wrong? I think that's right. And I thought Camillo Robles further said that it has to be clearly established that his conduct amounted to deliberate indifference in order for him to be deemed liable as a supervisor for the underlying constitutional right, assuming that was clearly established. That is right, Your Honor. It is a very high bar for supervisory liability. I'm now asking the government, are you suggesting to us that the reason plaintiff cannot show the deliberate indifference prong of section 1983 liability is because it is not clearly established that his conduct was deliberate indifference? Or are you asking us to find that it simply was not deliberate indifference? Because depending on what we do on that score might bear on the question of whether to dismiss or remand the intentional emotional affliction claim, because it's a little hard for me to see how, if it was not deliberate indifference, it could nonetheless be intentional affliction. Right. I think we are urging actually both, both clearly established and as a plausibility matter on the allegations, that these allegations concerning isolated, vague instances, as well as an allegation of actually making a, quote-unquote, greedy disclosure in advance of trial, cannot state a deliberate indifference claim by the supervisor. At the last point, the part that most concerned me with respect to deliberate indifference is the explanation for why he was not concerned by the beaker being found that was contaminated with a light powdery substance. And the explanation seemed to be that he thought it must have been a child doing a science experiment in a state drug lab. I just am baffled by that. Why would that have occurred to him as what must have been going on? On a motion to dismiss, I can't speak to his state of mind. I can only say that, as alleged, within, I think, 10 days of that discovery, Mr. Hanchett discovered the open cocaine packets and contacted the state police. So either for consideration of indifference or notice or causation, within days, Mr. Hanchett responded. Are you saying that that did constitute notice then? I don't think so at all. That's what I'm troubled by. He encounters a beaker, and his conclusion is, nothing to see here. It must be a child having done a science experiment in my state drug lab. Didn't he ask her, and she denied it? Yes. So he confronted Ms. Clark and asked, and she denied it. I know that. But then what I'm just struck by is his default was, a kid must have been in the drug lab doing a science experiment. That just seems shocking. Did kids come to the drug lab? I don't think that is in the record, but I can only assume that if he made that operation, it would be a reason to think that is an odd way to have responded to that incident. It may have been, but to the extent any notice allegations are made, they are mirrored with allegations of Ms. Clark's deception and her denials to Mr. Hanchett. And again, very close in time to the discovery of the beaker, Mr. Hanchett made disclosure to the state police. Thank you very much, Your Honor. Thank you. Mr. Ryan. May it please the Court. James Hanchett had a grand total of three subordinates at the Amherst Drug Lab. It is undisputed that one of those subordinates was under the influence of mind-altering drugs day in, day out for close to a decade. Excuse me, Counsel. You've got only a very small amount of time, and I don't mean to be rude to you, but it should have been evident from the colloquy with your brother that our first concern is whether or not there existed at the time, at the relevant time, whether that's 2012 or 2013, any clearly established law that would get you past qualified immunity. I appreciate that. Is there any case involving supervisory liability on the part of a supervisor in the drug lab or a comparable set of circumstances to which you can appoint us? Any Supreme Court case, any federal appellate case decided prior to those days? Not to that level of specificity, Your Honor. But is not the level of specificity that's required? It can't be at 10,000 feet. There's got to be, that's why I said any comparable official. I mean, it's clear there's been a Brady obligation recognized for years, but you've got to have something that brings the Brady obligation home to someone in a position comparable to the position that your defendant, Hann Chabot, is in. I think what we have is we have from as early as 2002 and 2001 decisions from this court indicating that if you're acting on the government's behalf, you're a part of the prosecution team and you have Brady responsibilities. No, no, our cases are nowhere near as broad as that. Right, but I think when you're talking about specificity, a couple of things are really important. One, we're not in the Fourth Amendment context where the Supreme Court has said, this is really where you need specificity. For the officer on the street, they need to have a prior case that's on all fours factually. Have you read our Eves v. LePage en banc decision? I have, Your Honor. That's also not a Fourth Amendment case, and we do talk about the level of specificity needed. Right, and I think what we're at, and why I started with the facts, is because if you go back to the Supreme Court's decision in Lanier where they cite the circuit judge's dissenting opinion where they raise the issue of there is no case on point that has ever said that the Department of Social Services employees could be held liable for selling children into slavery. If such a case were to occur, we could all agree that that would be a constitutional violation, even though there's no prior precedent directly on point. And what I think you have in this case is you have egregious facts that would have made it abundantly clear to anyone looking at this Court's precedent, the Supreme Court precedent, there's a level of extrapolating that has to be done. Can I back you up one step so I understand something? I had thought that the constitutional violation could be committed, and you could still win if you can show the supervisory liability, but that the constitutional violation could be committed entirely by Farrar. Correct. Because the way Section 1983 works, there's that constitutional violation, and then the statute provides a tort to get a remedy for it, if you can show supervisory liability by someone for that constitutional law, even if the supervisor has no constitutional obligation to do anything. That's exactly how it is. Okay, so assuming that's right, at the first level question, what is your answer to the State's objection that there was no authority as of the relevant time that Farrar was a member of the investigative team such that she would have a Brady obligation? Well, I think it's clear from even Melendez-Diaz, which obviously is not a qualified immunity case, but you've got a Supreme Court decision acknowledging that these chemists perform a statutory role. They have an obligation to assist the police in test samples. But Melendez-Diaz doesn't say that they have a Brady obligation. No, but I think it... So do you have a case in which there's somebody like that? In other words, one way to think about Brady obligations, the prosecutions started, and all the people working on that particular prosecution would be part of it. Then you have a lab back there that's just, without knowing what's going on with the prosecutions, is testing lots of stuff. Should we treat the people in that lab as if they're on the investigative team? It doesn't seem obvious, and if it's not obvious, that's a problem for you. So do you have some authority that suggests it would have been known at the time that that person was on the team such that Brady applied? I think the case law, and I don't think anybody would argue that, for example, Haley v. City of Boston, that when the police keep the prosecutor in the dark, they're committing a Brady violation. Correct. But there the police... Haley's case I know a little bit about. And that's a case where the police are part of the prosecution team, an important part of it. Right. And no one is defending the conduct of this chemist here. What we're searching for is whether there's some analogy that can be used as a springboard to say that the law was clearly established in 2012 or 2013. And if Haley is the closest case you've got, that's not going to be much help to you. Well, I think we need to look at who was signing Sonja Farrick's checks in the end of 2012, 2013. It was the Massachusetts State Police. She was a chemist for the State Police, so I think this is how... I'm sorry. I thought she worked for public health during this time period, and later the responsibility for the lab is assigned to the State Police. Correct. At the time of Mr. Panate's arrest and the testing by Ms. Farrick, or alleged testing by Ms. Farrick of the substances, she worked for DPH. On July 1, 2012, she became... And how would working for the State Police automatically translate into she was a member of the prosecution team in this case? Well, she was a member of the prosecution team when she worked for DPH. She was a chemist in the case. She was assigned to analyze these samples. All I'm saying is... Do they give them the... I mean, is she aware that there's an ongoing prosecution when she's testing it? Does the record show that? Yes, she's assigned the samples in Commonwealth v. Panate. And she, in that particular case, ingested LSD... in the case. There's no reason not to treat the chemist. Right. She responded to discovery requests in the case. She's a part of this team. She had received discovery requests in that case? She had. And that's in the complaint that she, on November 18, 2012, she responded by this point as a member of the State Police, as an employee of the State Police, with a, obviously... Was there any case you're aware of, as of 2012, that held a chemist in her situation, an alley situation, did not have a Brady obligation because they were not part of the team? The only one that I think Mr. Jacobson's best case is the Eighth Circuit decision in Villasana. And wasn't that, though, a question of whether she had an obligation to provide the information directly to the defendant? Or am I wrong about that? That was both. That's the one of the four that was cited by Judge Gertner in the Charles decision that actually does stand for the proposition that there's no Brady obligation of chemists or anybody but prosecutors. That's a real outlier from the Eighth Circuit. How do you answer that? I thought there were two Fifth Circuit decisions that went along with the Eighth Circuit. There's an initial Fifth Circuit decision from 2001 that I would argue Brown v. Miller in 2008 makes it clear that chemists absolutely have Brady responsibilities. That's a Fifth Circuit case relied on by the district judge in denying qualified immunity in this case. There's also a Sixth Circuit case. Where they didn't reach the issue. They didn't decide the issue. They just discussed it. Oh, no. In Brown v. Miller, the Fifth Circuit decision. No, the Sixth Circuit. That's the city of Louisville case. Pierce v. Gilchrist, the Tenth Circuit case that this court has cited in Burke v. Town of Walpole. Burke v. Town of Walpole, I think, is from this court. And it's a decision that I think is on the probable cause stage. But I think anybody reading that would look at that as Judge Talawani did and say there's no way to distinguish, defensible distinguish from probable cause versus a due process violation. And so I think that decision is one that should have put the district judge on notice. If he gets past that, then our next step in the analysis is the supervisory liability. And you concede under Kamala Robles that you have to show that it was clearly established that his conduct was of a kind that would make him deliberately indifferent to the clearly established constitutional violation. Right. And I don't think you can get more deliberately indifferent to your supervisory responsibilities than Mr. Hanchett was. Ms. Farrick said there was no oversight at the Amherst Drug Lab. When the district judge in this case said arguably that James Hanchett was a supervisor in name only, that's because he was. But no oversight alone is not enough. He's got to have some red flags of some kind. So what are the red flags? When does the Dukin, when does he become aware of the Dukin problem? It was in the complaint August 30, 2012. That lab gets shut down. That's widespread notice. And from the moment the Dukin thing becomes known to the supervisor here, what specific information does he have about problems in his own lab? He has an immediate aftermath of this. When he does his first audit ever of the standards at his lab, he discovers that they are way below what he anticipated they should have been. He has no way of knowing for sure because he hasn't been keeping track of the drugs entrusted to him in violation of a federal regulation that obviously is there because these are dangerous, addictive drugs and the people who handle them are susceptible to doing what Ms. Farrick did. So he, after the Dukin case, had a subordinate that the record indicates was leaving her bench where she's testing 10 to 12 times a day to smoke crack throughout the workday. This idea that – I'm sorry. There's no allegation he knew that she was smoking crack. That's correct. But he knew or should have known that she was high every single day she was there or she was suffering from – But isn't this – I mean, maybe I'm getting disoriented here. But I thought the test was there's got to be evidence of deliberate indifference to his constitutional obligation, not deliberate indifference to his supervisory duties. Those are two different things. If the constitutional obligation that we're discussing is Ms. Dukin's – not Ms. Dukin. It's the chemist's failure in this case to give proper and accurate test results with respect to the samples given by the defendant. Our inquiry has to be what evidence is there that he was deliberately indifferent to her breach of her constitutional obligation. It seems to me that he – that although he certainly wasn't a very good person, administrator for this laboratory for a long period of time, he acted reasonably promptly after the Dukin scandal broke and eventually was the one who disclosed this to the police. How much time went by before the Dukin scandal broke and the time that he made the disclosure? Approximately four and a half months, rather. But I think what we have here is – And against a backdrop where, as you said, he had no baseline. He had no audit reports, nothing. So at that point, if he started the day after the Dukin scandal became public, he would have had to start from scratch. That may have been his own fault or at least partially his own fault, but we're looking at deliberate indifference to her constitutional breach. Right, and I think it's important to make clear two things. First, he did not discharge his Brady obligations in Mr. Panate's pending criminal case. He discharged them in two completely unrelated cases when he said, Oh, my God, those samples are no longer here or they're plainly fraudulent. Let me call the state police. After that happened, he immediately took the position that this was a sudden fall from grace from a dedicated professional who couldn't possibly have been doing this the entire time he was a supervisor at the lab. The second thing that's important to note is in his supervision of her, in a typical supervisory liability case, we all look at the personnel file and we go through and we say, Oh, were there red flags that would have put somebody on notice that this person was in danger of committing the constitutional violation that they did? Here, you had a system that Mr. Hinshet presided over that didn't allow for the production of any red flags. He didn't conduct performance reviews. Those are limited by the state. They had a terrible system because the state underfunded these labs. It does not get you to deliberate indifference on his part. He did, in fact, go to her and ask her about the abnormalities. She denied that there was any problem with that. In light of that, how can you say he's deliberately indifferent? I think we can circle back to an example like the dirty beaker where when she denied it, he went to a place of, Oh, it must have been a child who was conducting a science experiment. Yes, but if you have a trusted employee, maybe he should not have, and that employee says, No, I didn't have anything to do with this, then you do tend to look for other explanations. They may have been silly. I don't know. That explanation I have, that does seem like a jury at that point. I have some basis for thinking. But put that choice aside. What was the time gap between his representation that it must have been a child doing a science experiment in the state drug lab and him taking action? The record reflects, there's not a specific date, but it was the Christmas vacation just after that in early January 2013. Your brother said it was ten days. Are you disputing that? I'm disputing that because ten days would be January 9th, and I think it's probably something closer to two weeks or three weeks. But if it's that time period, so in other words, he asks the employee, the employee says, It's not me. He says, It must be a science experiment. Then at some point, though, what's the next thing that happens? He discovers the missing... I think if we go back in time, you have... No, no, I don't want to go back in time. I want to stay right here. Right, okay. At that point, what happens? He goes and checks the pill, finds the missing pills? Is that the next thing that happens? The next thing that happens is on January 18th, one of his other subordinates says, Okay, I can't find these two missing samples. He and the subordinate look for it. They go to Ms. Farrick's desk. They find what should be the sample. In her custody, it's been torn open. If one is missing, the other one has a material that clearly isn't crack cocaine, and he calls up the state police. So I guess what I'm trying to isolate is the thing that I don't know how this works. If there was a point in time where deliberate indifference could be shown, one might think it was at the point where he finds the beaker with the white substance and comes up with a highly surprising account of why that's not a problem. But that's followed up two weeks later with him discovering something and acting on it. So that would show, at most, deliberate indifference for that two-week period. How would that help you? Not as much as it would help to show that in 2008. How would it help you at all? What would you then do for purposes of showing a tort? For those two weeks he didn't do anything? How would you show causation? I think these instances are just emblematic of day-in, day-out disregard for basic supervisory responsibilities. The drugs that Ms. Farrick took, she didn't bring them into the lab. She was taking them out of the lab. His stock of drugs over which he was responsible was daily being depleted by a world chemist. Okay, so you're back to the pre-beaker period, right? Do you think your argument depends on that? I think that what you have is a course of conduct by Ms. Farrick from the day that she started there that would have put a reasonable supervisor on notice that you had a chemist who was stealing from the lab. And that's my argument. Thank you very much. Thank you. Your Honor, I just want to be clear. I may have just spoken about 10 days. It may have been as much as 14. But the allegation is that Ms. Farrick used the beaker in the first week of January 2013. That's paragraph 184. And that sometime afterwards Mr. Henshaw discovered it, and then on January 18th he contacted the state police. I don't think given the disclosure and that this is 11 months in advance of the trial where Ms. Farrick's drug evidence, after all, was withdrawn, that either saves the 1983 claim or indeed saves the intentional infliction of emotional distress claim. Unless the Court has further questions, I rest on my argument in my papers. Thank you. Thank you both. Thank you.